UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

RHONDA HARRIS                                              CIVIL ACTION

VERSUS

SEASIDE HCBS, LLC, ET AL.                        NO. 18-00994-BAJ-RLB

RULING AND ORDER

This dispute arises from claims that Defendants knowingly engaged in duplicate billing for behavioral health services, in violation of the Federal False Claims Act ("FCA") and the Louisiana Medical Assistance Program Integrity Law ("MAPIL"). Now before the Court are Defendants' motions to dismiss Plaintiff-Relator Rhonda Harris's *qui tam* complaint and the State of Louisiana's complaint in intervention. (Docs. 41–42). The Motions are opposed. (Docs. 47–48).

For reasons to follow, Defendants' Motion to Dismiss Relator's *qui tam* complaint will be **GRANTED IN PART,** with opportunity for Relator to amend. Defendants' Motion to Dismiss the State's intervention complaint will be **DENIED**.

I.  FACTUAL BACKGROUND

The allegations relevant to the claims—which the Court accepts as true for present purposes—are as follows:

Defendant Seaside Healthcare HCBS, LLC, is a healthcare entity that provides behavioral home- and community-based healthcare services to its clients. (Docs. 1, ¶ 19; 27, ¶ 3). Seaside's services include community psychiatric support and treatment ("CPST"), psychosocial rehabilitation ("PSR"), multi-system therapy

1

("MST"), and intensive outpatient therapy ("IOP"). (Doc. 27, ¶ 4). Seaside maintains facilities across multiple states, including Louisiana. (*See* Doc. 1, ¶ 20). In Louisiana alone, Seaside operates over a dozen locations, offices, and inpatient hospitals, stretching from Shreveport to New Orleans and Monroe to Lake Charles. (*See* Doc. 1, ¶¶ 21, 22).

Healthcare providers, like Seaside, contract directly with State-affiliated "managed care organizations" ("MCOs") to provide services to eligible Louisiana Medicaid beneficiaries. (Doc. 27, ¶ 22). The behavioral health services that Seaside provides are among the benefits covered by the Louisiana Medicaid program. (Doc. 27, ¶ 23). Claims for CPST, PSR, MST, and IOP services billed through Medicaid are based on "units," with a single unit consisting of 15 minutes. (Doc. 27, ¶ 28). "For example, if a counselor provides 1 hour of PSR to a client, the provider would submit a claim of [4] units for the service." (Doc. 27, ¶ 28).

### A. Former Employee Rhonda Harris' Observations

Relator Rhonda Harris is a licensed mental health practitioner and former employee of Seaside's Cognitive Development Center in Tallulah, Louisiana. (Doc. 1, ¶¶ 27–28). Relator started as a part-time onsite counselor in 2011 and eventually became the site director in 2016. (Doc. 1, ¶¶ 28–29). As the site director, Relator was "responsible for overseeing all aspects of the facility including patient care, employee management, and financial." (Doc. 1, ¶ 30). Relator alleges that between 2016 and 2017 she became aware that Defendants were submitting false claims for payment of

services that were medically unnecessary, "up coded,"[1] and never performed, which were then improperly billed and paid by Medicare and Medicaid. (Doc. 1, ¶¶ 28–32). Relator further alleges that she was terminated in August 2017, after she refused to participate in these fraudulent activities. (Doc. 1, ¶ 31).

Relator alleges that Defendants established company-wide policies that required signing up patients to multiple therapy programs that were medically unnecessary, thereby billing for both individual and group therapy sessions that never occurred. (Doc. 1, ¶ 42). Defendants also mandated that billing should be "up coded" to reflect the maximum number of units on every patient, *without* the services being performed. (Doc. 1, ¶ 45). By way of example, Relator alleges that on July 10 and July 28, 2017, Defendant's employee, Jonathan Reeves, formatted clients' assessment forms so that the signature pages intentionally appeared on separate pages, with no other identifying information on them. (*See* Doc. 1, ¶¶ 43–44). Defendants then requested authorization for units of treatment that had not been approved, billed for treatment plans that never occurred, and intentionally falsified signatures of licensed therapists. (Doc. 1, ¶¶ 43–44).

Relator also alleges that Defendants purposefully billed for assessments, treatments, and plans *separately*. (Doc. 1, ¶ 46). The separate billing of these events resulted in unlawful triple billing. (Doc. 1, ¶ 46). In addition, Relator claims that, on August 10, 2016, Defendants purposefully recruited Medicare and Medicaid patients

---

[1] "Up coding" is the practice of billing "for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *United States* ex rel. *Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 497 n.2 (6th Cir. 2007).

by advertising a "back to school" party with free food, games, and prizes in exchange for completing a demographics packet upon entry. (Doc. 1, ¶ 47). Finally, Relator alleges that Defendants knowingly and recklessly entered into agreements to provide improper kickbacks in return for new patient referrals. (Doc. 1, ¶ 48). Specifically, Relator claims that Defendants' employees falsified medical records by recycling old patient files and resubmitting them as new patients in order to collect the kickbacks. (Doc. 1, ¶ 48).

### B. State of Louisiana's Investigations

In its intervention complaint, the State alleges that Defendants engaged in a practice of improperly billing for services that were not performed, started as early as May 2012 and continuing through at least January 2019. (Doc. 27, ¶ 6). The State provides specific examples from January 2015 through October 2017. (*See* Doc. 27, ¶ 36). According to the State, to effect this practice, Defendants used different national provider identification numbers ("NPIs") assigned to its different statewide offices to submit multiplicitous claims. (Doc. 27, ¶¶ 36–37).

Specifically, the State alleges that Seaside submitted two separate claims for payment of an MST service provided to a client on February 2, 2016. (Doc. 27, ¶ 37). One of the claims was submitted using one NPI on February 15, 2016, and was paid on February 24, 2016; the second claim was submitted using a different NPI on March 11, 2016, and was paid on March 25, 2016. (Doc. 27, ¶ 37). The State provides two progress notes for this particular MST service. (*See* Doc. 27-2). The progress notes are identical except for the note identification number that accompanies each service log.

4

(*See* Docs. 27, ¶¶ 39–40; 27-2). Thus, the State argues, Seaside submitted two separate claims for 8 units of MST services each, when the documentation only supports a maximum of 4 units actually rendered to the client, causing an overpayment to Seaside of 12 units. (Doc. 27, ¶¶ 39–43).

Further, the State alleges that Seaside submitted claims for services that were completely undocumented. (Doc. 27, ¶ 44). For instance, Seaside purportedly rendered PSR services to a client on February 9, 2016, and February 11, 2016, and CPST services on January 30, 2016; February 13, 2016; and February 15, 2016. (Doc. 27, ¶ 45). However, when requested, Defendants failed to produce any documents supporting these services. (Doc. 27, ¶ 45). In addition, each of these five services provided to the client were billed twice through Medicaid. (Doc. 27, ¶ 46).

The State also claims that Seaside was aware of its billing issues and failed to take corrective action. (Doc. 27, ¶ 47). On June 30, 2016, on behalf of United Healthcare—a State-affiliated managed care organization—Optum notified Seaside that a review of its claims "revealed significant double-billing for services, for the same member[s], on the same date of services, for the same treatment, at different practice locations, which were at times over 100 miles apart," between December 1, 2015, and February 24, 2016. (Doc. 27, ¶ 48). United recouped $256,348.62 for duplicate claims submitted between April 2015 and May 2017. (Doc. 27, ¶ 48).

Despite receiving notice of the discrepancies by August 25, 2017 (at the latest), Seaside did not review its claim submissions to determine if other duplicate billings existed. (Doc. 27, ¶ 49–50). On August 25, 2017, Leon Jackson, an HCBS Director of

5

one of the Cognitive Development Centers, sent an email to other Seaside employees about the billing issues. (Docs. 27, ¶¶ 51–53; 27-4). In part, the email stated:

> The purpose of this email is to share some concerns that our corporate office have brought to my attention and holds me responsible for correcting. In a recent report produced by our corporate office there exist some troubling findings. For claims submitted from July 1, 2017[,] to present, we have nearly 450 transactions without a signature. Even more troubling is the fact that there exist far too many incidents with duplicate billing, wrong codes, and overlapping times. What is even more disturbing, there are far too many to count. These are serious issues that must cease immediately[.] As you all are aware, we are dealing with government funds. Under an audit, such errors (even if innocent) could be construed as fraud.

(Doc. 27-4, p. 2 (emphasis removed)).

Despite this purported knowledge of the duplicate billing issues, Seaside failed to take reasonable action to identify any other overpayments. (Doc. 27, ¶ 53). The State contends that there are over 6,000 claims that appear to be un-recouped duplicate billings. (Docs. 27, ¶ 54; 27-5).

## II. PROCEDURAL HISTORY

Relator filed suit on November 2, 2018. (Doc. 1). After years of extensions of time to intervene, the United States, Georgia, and North Carolina noticed their intent to not intervene on August 12, 2021. (Docs. 18, 19). The State of Louisiana noticed its intent to intervene on October 10, 2021, and filed its complaint on January 10, 2022. (Docs. 22, 27). The action—originally under seal—was unsealed on November 10, 2021. (Doc. 24).

Defendants now seek dismissal of Relator's *qui tam* complaint and the State's intervention complaint. (Docs. 41–42). Defendants' motions are opposed. (Docs. 47-48). For reasons set forth below, Defendants' motion to dismiss the *qui tam* complaint

will be granted in part, with opportunity for Relator to amend. Defendants' motion to dismiss the State's complaint in intervention will be denied.

## III. DISCUSSION

### A. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

"[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Hence, the complaint need not set out "detailed factual allegations," but something "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" is required. *Twombly*, 550 U.S. at 555. When conducting its inquiry, the Court "accepts all well-pleaded facts as true and views those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

Pleadings alleging fraud are held to a heightened standard under Fed. R. Civ. P. 9(b), which states that "a party must state with particularity the circumstances constituting fraud or mistake." "Rule 9(b) has long played that screening function . . . to weed out meritless fraud claims . . . . We apply Rule 9(b) to fraud complaints with 'bite' and 'without apology.'" *United States* ex rel. *Grubbs v. Kanneganti*, 565 F.3d 180, 185–186 (5th Cir. 2009) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)).

"At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel-Phonic Services, Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) (internal quotations omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260.

Such allegations of fraud may be pleaded on information and belief, however, such allowance "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations," and must set forth a factual basis for the belief. *United States* ex rel. *Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 n.67 (5th Cir. 2002)). And while fraud allegations must be pled with particularity, "the 'time, place, contents, and identity' standard is not a straitjacket for rule 9(b)." *Grubbs*, 565 F.3d

at 190. The rule is "context specific and flexible" so as to not "stymie[] legitimate efforts to expose fraud." *Id.*

The particularity requirement of Rule 9(b) applies to actions alleging violations of the FCA. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 196 n.6 (2016); *Grubbs*, 565 F.3d 180. The FCA penalizes persons who "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). MAPIL provides that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim." La. R.S. 46:438.3. Because the corresponding MAPIL provisions mirror the FCA provisions regarding false or fraudulent claims, the Rule 9(b) particularity requirement applies to claims brought under MAPIL in addition to the FCA.

**B. Discussion**

**1. Relator's *Qui Tam* Complaint**

Defendants make several arguments in support of their motion to dismiss Relator's *qui tam* complaint.

*a. Specificity of Allegations*

First, regarding counts one, two, and three of Relator's complaint, Defendants point to the three requisite elements to plead a violation of 31 U.S.C. § 3729(a)(1)(A): (a) the presentment of a claim, (b) that the claim is false or fraudulent, and (c) knowledge that the claim presented was false or fraudulent.

i. Presentment of Claims

Defendants first argue that the allegations lack any specifics about the presentment of claims to the Government. (Doc. 42-1, pp. 4–7). Defendants contend

9

that Relator has not met the *Grubbs* standard of pleading the requisite time, place, and identity details. (Doc. 42-1, pp. 6–7).

Defendants' argument that Relator's allegations are too conclusory is unpersuasive. The Court finds that Relator has sufficiently pleaded the specificity necessary under *Grubbs*. Despite Defendants' contention that the *qui tam* complaint contains only sweepingly conclusory allegations, the *qui tam* complaint *does* contain specific dates, locations, and identities. As one example, Relator alleges that on July 28, 2017, Jonathan Reeves formatted a client's assessment form so that the signature page fell with no other identifying information on it, so that the signature page could be used to intentionally falsify evaluations and documents. (Doc. 1, ¶ 43). Without the benefit of discovery, Relator has sufficiently pleaded the necessary specificity.

### ii. False Certifications

Defendants next contend that Relator's complaint does not adequately plead the false certification element. (Doc. 42-1, pp. 8–9). "[T]he Fifth Circuit has repeatedly held that a relator can not maintain a FCA case unless: (1) the provider was required to file a certification in connection with the claim; (2) the filed certification was false; and, (3) relator identified specific claims and/or certifications that were fraudulent." *Thompson v. LifePoint Hosps., Inc.*, No. CV 11-01771, 2013 WL 5970640, at *3 (W.D. La. Nov. 8, 2013) (Haik, J.) (citing *United States* ex rel. *Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997); discussing *United States* ex rel. *Nunnally v. West Calcasieu Cameron Hosp.*, 519 Fed. Appx. 890, 894 (5th Cir. 2013)). Where the Relator has "set out the procedure and process by which defendants could

10

have produced false claims, but provides no facts that this process did, in fact, result in the submission of false claim[,]" the Court may find that Relator has not met its pleading burden. *Id.* at *4.

Taking all of Relator's allegations as true, Relator has certainly painted a picture of a possible scheme by Defendants to defraud the Government. Yet, Relator has not identified a single claim that was actually submitted pursuant to the alleged scheme. However, the Court must not miss the forest for the trees. There are substantially more specific allegations included within the State's complaint in intervention.[2] Further, Relator ensures the Court that "[s]hould the Court wish more detail . . . she is more than prepared to file an amended complaint at the Court's desire." (Doc. 47, p. 12). To this end, the Court will permit Relator to amend her *qui tam* complaint to satisfy this requirement.

### iii. Anti-Kickback Statute Violations

Defendants also argue that Relator's complaint does not adequately plead a falsity or fraud under the Anti-Kickback Statute ("AKS"). (Doc. 42-1, pp. 9–11). The AKS prohibits "(1) the solicitation or receipt of remuneration in return for referrals

---

[2] Relator begins her oppositional argument with the contention that the State's complaint, since its intervention, has now become the "operative" complaint in the matter. (*See* Doc. 47, pp. 5–7). She cites to and quotes a federal district court case for the assertion that "the appropriate action for the Court to take when a defendant moves to dismiss those portions of a relator's complaint that have been superseded by government intervention is to deny the motion as moot as it relates to the intervened claims." (*See* Doc. 47, pp. 5–6; *United States v. Pub. Warehousing Co. K.S.C.*, 242 F. Supp. 3d 1351, 1357 (N.D. Ga. 2017). Relator cites to no other authority for this proposition, and neither do Defendants. Without more, the Court will not judicially find or determine that Relator's complaint has been "superseded" by the State's complaint. Further, under Relator's proposition, the only claims that *could* be "superseded" are Relator's MAPIL claims, as the State only alleges liability under MAPIL—not the FCA. (*See* Doc. 27, ¶¶ 55–71). Regardless, the Court will permit Relator to amend her complaint to satisfy her burden at this pleading stage.

of Medicare patients, and (2) the offer or payment of remuneration to induce such referrals." *Columbia/HCA Healthcare Corp.*, 125 F.3d at 901 (citing 42 U.S.C. § 1320a–7b(b)). An AKS violation must "be pleaded with particularity under Rule 9(b), because they are brought as a FCA claim." *Lifepoint Hosps., Inc.*, 2013 WL 5970640, at *5. Conclusory claims that do not contain any detail about the alleged agreements between the facility and the physicians or the identity of the physicians who entered into the kickback agreements do not meet the necessary standard. *Nunnally*, 519 Fed. Appx. at 897.

Here, Relator merely states that she has specific knowledge that Defendants entered into agreements to provide improper remuneration of $100 as kickbacks in return for new patient referrals, and that Relator knows that employees falsified medical records by recycling old patient files and re-submitting them as new patients to collect the kickbacks. (Doc. 1, ¶ 48). Relator does not include the identity of any physician or employee who allegedly engaged in this scheme to collect the kickbacks. This general allegation is insufficient, at present, to satisfy Relator's burden. Relator will be permitted to amend her complaint to include the requisite specificity.

### iv. "Knowing" Presentment

Next, Defendants argue that the *qui tam* complaint does not allege a "knowing" presentment of false claims. (Doc. 42-1, pp. 11–12). Defendants assert that the *qui tam* complaint only "generally alleges 'company-wide' policies without any specification of who made those policies, when, or which company or company representative." (Doc. 42-1, pp. 11–12). But Rule 9(b) specifically allows that

12

"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *Bollinger Shipyards, Inc.*, 775 F.3d at 260. The Court will not find, at this stage of litigation, that Relator has failed to meet her burden regarding the allegations that Defendants knowingly presented the false claims.

v. Lack of Other FCA Violation

Regarding counts one, two, and three, Defendants also contend that—because Relator's complaint does not sufficiently allege any other FCA violation—Relator's allegation that Defendants violated 31 U.S.C. § 3729(a)(1)(C) must also fail. (Doc. 42-1, p. 12). The statute is violated when a person conspires to commit a violation of another provision of the FCA. *See* 31 U.S.C. § 3729(a)(1)(C). While the Court denies Defendants' request at this time, because the Court will permit Relator to amend her complaint to satisfy the necessary pleading requirements concerning the false certification and AKS violations, the Court will also reserve Defendants' right to reassert this argument pending Relator's amendment.

b. *Unjust Enrichment*

Defendants also argue that Relator's count four—an unjust enrichment claim—must fail under both federal and state law. (Doc. 42-1, pp. 12–14). Relator, in her opposition, concedes that she may not assert a common law cause of action on behalf of the United States under the FCA. (Doc. 47, p. 12).

In addition, however, Relator baldly asserts that "given the State of Louisiana's Complaint of Intervention, which is grounded in both statutory relief and Civil Law including equitable claims, the claim of Unjust Enrichment is alive and

13

well in this matter, and Relator is now a party to those claims." (Doc. 47, p. 12). This statement comes out of the blue, and is not accompanied by any argument or authority, other than to cite to La. R.S. 46:439.2, "Qui tam action procedures." (*See* Doc. 47, p. 12).

The Local Civil Rules require that parties support their arguments with "a concise statement of reasons . . . and citations of authorities," M.D. La. L.R. 7(d), and this Court has repeatedly admonished that it will not speculate on arguments that have not been advanced or attempt to develop arguments on a party's behalf. *Doe v. Bd. of Supervisors of the Univ. of Louisiana Sys.*, --- F. Supp. 3d ----, ---- n.13, No. CV 22-00338-BAJ-SDJ, 2023 WL 143171, at *17, n.13 (M.D. La. Jan. 10, 2023) (Jackson, J.); *Buchicchio v. LeBlanc*, No. CV 22-00147-BAJ-EWD, 2023 WL 2027809, at *10 (M.D. La. Feb. 15, 2023) (Jackson, J.). Pursuant to the Court's Local Rules, and consistent with the general rule that a party's failure to adequately brief an issue acts as a waiver, Relator has waived her challenge to the dismissal of the unjust enrichment claims. As such, Relator's unjust enrichment claims will be dismissed, without leave to amend.

               c. *Louisiana MAPIL Claim*

Lastly, Defendants contend that Relator's count five, alleging violation of the Louisiana MAPIL, must be dismissed. (Doc. 42-1, pp. 14–16). Just as they did under the FCA, Defendants argue that Relator has not sufficiently pled, with specificity, any violations of MAPIL. (Doc. 42-1, pp. 14–16). Because the Court will permit Relator to amend her complaint to include the necessary information for an FCA

violation allegation, the Court will similarly allow such an amendment here. Relator will be permitted to amend her complaint to satisfy the requisite specificity for her claim under MAPIL.

### 2. State of Louisiana's Complaint in Intervention

Defendants raise three separate arguments as to why the State's complaint in intervention fails to plead actionable claims under MAPIL. (Doc. 41-1, pp. 7–14).

#### a. *"Knowing" Submission and Misrepresentation*

First, Defendants contend that the State failed to sufficiently allege facts to show that Defendants knowingly submitted fraudulent claims to the MCOs or that they knowingly misrepresented the claims presented to the MCOs. (Doc. 41-1, pp. 8–11). Again, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *Bollinger Shipyards, Inc.*, 775 F.3d at 260. While it might be the case that, as Defendants point out, an administrator's "after-the-fact interpretation of the situation" may not "establish that the individuals submitting the claims knew that they were submitting false claims," *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (upholding district court's granting of summary judgment), the State has provided more than enough in its allegations to meet its less-stringent Rule 8 standard. The State has provided not only an email from an employee discussing the multiple billing, but also alleges that the MCO sent remittance advices to Defendants, advising Defendants of particular claims that had already been submitted for payment. (Doc. 27, ¶ 43). Defendants' request for dismissal for failure to plead Defendants'

knowledge is denied.

### b. *Failure to Audit or Remit*

Defendants next argue that the State failed to sufficiently allege facts to show that they discovered the duplicate billings and failed to audit or remit the duplicate payments to the MCOs. (Doc. 41-1, pp. 12–13). Apparently, Defendants would have the Court overlook the State's allegations that Optum, on behalf of MCO United Healthcare, notified Defendants of "significant" double-billing issues on June 30, 2016, regarding claims submitted between December 1, 2015, and February 24, 2016. (Doc. 27, ¶ 48) Optum then recouped $256,348.62 for those claims submitted between April 2015 and May 2017—beyond the range that Optum originally stated in its notice to Defendants. (*See* Doc. 27, ¶ 48). Even after these events, the State alleges that Defendants *still* had a significant double-billing issue, because a director of one of the facilities sent an email on August 25, 2017, stating, in part, that "[f]or claims submitted from July 1, 2017[,] to present, we have nearly 450 transactions without a signature." (Doc. 27-4, p. 2). Putting all of the allegations together, it appears that Defendants did not audit or review their claim submissions to determine if other duplicate billings existed, even though evidence was presented of possible multiple-billing from *at least* April 2015 until August 25, 2017, even after Optum had recouped $256,348.62 based on Defendants' multiple-billed claims.

The Court is not so easily persuaded by Defendants' assertion. The State has pleaded sufficient allegations to permit the inference that Defendants violated § 438.3(C) of MAPIL. This issue is ripe for discovery.

### c. *Attempt to Defraud*

Finally, Defendants assert that the State, as Intervenor, fails to sufficiently allege that Defendants attempted to defraud the Medicaid program because the State fails to identify who, specifically, attempted to defraud the program. (Doc. 41-1, p. 14). The State contends that it specifically identifies Seaside's subsidiary companies as the actors who attempted to defraud the program, and that it need not identify specific personnel at this stage of litigation. (Doc. 48, pp. 11–12).

While the Rule 9(b) standard does require specificity, the rule is "context specific and flexible" so as to not "stymie[] legitimate efforts to expose fraud." *Grubbs*, 565 F.3d at 190. The Court will not require the State to plead a higher level of specificity than required by the Rule. Defendants' request is denied.

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that **Defendants' Rule 12(b)(6) Motion To Dismiss (Doc. 42)** Relator's *Qui Tam* Complaint be and is hereby **GRANTED IN PART**.

**IT IS FURTHER ORDERED** that Relator's unjust enrichment claim be and is hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Relator is permitted to file her amended *qui tam* complaint, if any, specifically addressing the deficiencies set forth herein, within **21 days** of the date of this Order. Defendants shall file their responsive pleading(s) within **14 days** service of Relator's amended complaint. **Relator's failure to timely file an amended complaint will constitute waiver and will result in dismissal with prejudice of Relator's claims dismissed by this**

Order.

IT IS FURTHER ORDERED that Defendants' Rule 12(b)(6) Motion To Dismiss (Doc. 41) the State's Complaint in Intervention be and is hereby DENIED.

Baton Rouge, Louisiana, this 27th day of March, 2023

_____
JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA